IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THOMAS A. NEUHARD and | : | Case No. 4:11-cv-01989 |
| BARBARA S. NEUHARD, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | (Judge Brann) |
| | : | |
| RANGE RESOURCES– | : | |
| APPALACHIA, LLC, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM
April 30, 2014

This case concerns a dispute over an oil and gas lease executed by the

Parties.  Thomas A. Neuhard and Barbara S. Neuhard ("Plaintiffs" or "the

Neuhards" or "Lessors") initiated the case by filing a Complaint in the Court of

Common Pleas of Lycoming County on September 28, 2011 (ECF No. 1, Ex. A).

The Neuhards seek a Declaratory Judgment clarifying that the oil and gas lease

("Lease") that they entered into with the Defendant, Range Resources–Appalachia,

LLC ("Defendant" or "Range" or "Lessee") expired by its own terms.[1]

On October 28, 2011, the Defendant removed this case to Federal Court

---

[1] The Defendant was Great Lakes Energy Partners, LLC at the time the Parties executed
the Lease.  The Defendant later changed its name to its current form: Range
Resources—Appalachia, LLC.

based on diversity jurisdiction, pursuant to 28 U.S.C. § 1332 and 28 U.S.C. § 1441 (ECF No. 1).[2]  Then-Chief United States District Court Judge Yvette Kane presided over the case until it was reassigned to United States District Court Judge Robert D. Mariani on November 16, 2011.  The case was subsequently reassigned to the undersigned on January 17, 2013.

The Defendant filed an Answer with affirmative defenses, and made a counterclaim seeking a declaratory judgment that the Lease is valid (ECF No. 7). The Plaintiffs filed an answer to the counterclaim (ECF No. 8).  Discovery was then conducted.

The case is presently before the Court on the Parties' cross motions for summary judgment (ECF Nos. 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34). The Court held oral argument on the motions on March 26, 2014.  There are no material facts in dispute, and the issues before the Court involve interpretation of contract provisions as a matter of law.  The Parties have fully briefed the issues and the case is now ripe.  Consequently, the case is amendable to disposition in its current posture.

As elaborated below, the Neuhards' Motion for Summary Judgment should

---

[2] The Plaintiffs are citizens of Pennsylvania.  The Defendant is a limited liability company organized under the laws of the state of Delaware.

be granted.  Range Resource's Motion for Summary Judgment should be denied.

## I.     BACKGROUND

On June 21, 2006, the Parties executed an Oil and Gas Lease.  Pls.'

Statement Material Facts ¶ 1, Dec. 14, 2012, ECF No. 23 [hereinafter "Pls.' SOF"].

The Lease provided Range the rights to procure oil and gas from forty-seven (47)

acres owned by the Neuhards situate in Lewis Township, Lycoming County,

Pennsylvania.[3]  Id. ¶ 4. The Lease contains a primary term of five years calculated

from June 21, 2006.  Pls.' Br. Supp. Mot. Summ. J. Ex.1, Dec. 14, 2012, ECF No.

26 [hereinafter Pls.' Br. Supp.].  Unless extended by the commencement of drilling

operations or as otherwise provided, the Lease would expire by its own terms on

June 21, 2011.

On June 13, 2011, Range executed a Designation of Unit document for the

"Null Eugene A Unit," which it filed with the Lycoming County Recorder of

Deeds on June 15, 2011.  Def.'s Statement Material Facts ¶ 28, Dec. 14, 2012, ECF

No. 27 [hereinafter "Def.'s SOF"].  The Designation of Unit Document indicates

that "by virtue of the authority conferred by the terms of the leases" it creates a

_____

[3] At some point during the period between June 21, 2006 and June 21, 2011, the
Neuhards were divorced.  In the property settlement agreement, Barbara Neuhard became the
sole owner of the surface of the 47 acres, and Thomas and Barbara Neuhard retained, equally,
their ownership interests in the subsurface rights to the property; these rights include the oil and
gas contemplated in the Lease.

395.0638 acre production unit comprised of nine separately owned parcels of land that includes the Neuhards' 47 acres.  Def.'s Br. Supp. Mot. Summ. J., Ex. 2(T), Dec. 14, 2012, ECF No. 26 [hereinafter Def.'s Br. Supp.].  A non-material fact remains disputed whether Range notified the Neuhards of the unit plan and their filing the Designation of Unit document prior to July 7, 2011.

Range did, however, acquire a Road Right of Way Agreement signed by Barbara Neuhard on June 16, 2011.  Def.'s SOF, ¶ 30.  The Agreement provided Range the right to widen and grade a turn on a local road to make it easier for Range's truck traffic to access the surface location from which they intended to drill the "1H" gas well on the Null property.  Range paid Barbara Neuhard $3,000 as consideration for this Agreement.  Id. ¶¶ 31, 41.

Range engaged in numerous other preparatory activities prior to drilling throughout the spring of 2011.  Range obtained several mandatory permits from state and local regulatory agencies, including drilling, zoning, and development permits.  Id. ¶¶ 11, 13, 14, 16–18, 22, 24.  Range contracted with an engineering firm to design a grading and erosion control plan for the well pad site, and entered into various agreements with other landowners regarding its construction.  Id. ¶¶ 9, 23, 26.  On May 28, 2011 Range began constructing the access roads and pad site for the well.  Id. ¶ 25.

On July 1, 2011, the Neuhards, by and through counsel, notified Range that it was the Neuhards' position that Range had failed to commence a well on the Neuhards' "Leased Premises," within the five year primary term of the Lease, and therefore, that the Lease expired by its own terms.  Pls.' SOF, ¶ 12.  Range responded by letter dated July 7, 2011, stating that it believed that it maintained the Lease by the commencement of a well on acreage unitized with the Neuhards' Leased Premises prior to the expiration of the Lease's primary term.

Range then continued its development of the properties.  Between May 28 and September 15, 2012, Range drilled three wells that extend in different directions from the same initial well pad, utilizing contemporary horizontal drilling technology not available in Pennsylvania at the time the Lease was signed.  See Def.'s SOF, ¶¶ 32–51.  The wellbores of two of the three wells pass under and through the Neuhards' 47 acres.  Id. ¶ 51.  As of December 2012, Range had expended approximately $4,000,000 in connection with drilling and completing the wells.  Id. ¶ 49.

## II.    DISCUSSION

### A.    Legal Standards

#### 1.    Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine dispute as to

any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could find for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). When the court considers the parties' arguments, "[t]he evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor." Id. at 255.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. In re Bressman, 327 F.3d 229, 237 (3d Cir. 2003) (internal citations omitted). The moving party may meet this burden by either (1) submitting positive evidence that negates an essential element of the nonmoving party's claim; or (2) demonstrating that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's case. Id. at 331.

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial or whether judgment as a matter of law is proper. Anderson, 477 U.S. at 249. The standard by which the court decides a summary judgment motion does not change when the parties file cross-

motions.  Weissman v. United States Postal Serv., 19 F. Supp. 2d 254, 259 (D.N.J. 1998).  When ruling on cross-motions for summary judgment, the court must consider the motions independently, Williams v. Philadelphia Housing Authority, 834 F. Supp. 794, 797 (E.D. Pa. 1993), aff'd, 27 F.3d 560 (3d Cir. 1994), and view the evidence presented for each motion in the light most favorable to the nonmoving party.  See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### 2.    Rules of Contract Construction

The Court exercises diversity jurisdiction over this case, and therefore state substantive law applies.[4]  See, e.g., Erie R. Co. v. Tompkins, 304 U.S. 64, 91–92 (1938).  Under Pennsylvania law, "a lease is in the nature of a contract and is controlled by principles of contract law."  T.W. Phillips Gas & Oil Co. v. Jedlicka, 615 Pa. 199, 208, 42 A.3d 261, 267 (2012).  Accordingly, "[t]he object in interpreting instruments relating to oil and gas interests, like any written instrument, 'is to ascertain and effectuate the intention of the parties.'"

---

[4] "In the absence of a controlling decision by the Supreme Court of Pennsylvania , a federal court applying that state's substantive law must predict how Pennsylvania's highest court would decide" an issue.  Berrier v. Simplicity Mfg., Inc., 563 F.3d 38, 45–46 (3d Cir. 2009).  "In predicting how the highest court of the state would resolve the issue, [the Court] must consider relevant state precedent, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand."  Id. at 46 (internal quotations omitted).

Szymanowski v. Brace, 2009 Pa. Super. 218, 987 A.2d 717, 720 (Pa. Super. Ct.

2009) (quoting Hess v. Jones, 335 Pa. 569, 7 A.2d 299 (1939)).

"It is a generally accepted proposition that when the terms of a writing are

plain and unambiguous, there is no room for interpretation or construction since

the only purpose of judicial construction is to remove doubt and uncertainty." 11

RICHARD A. LORD, WILLISTON ON CONTRACTS § 30:4 (4th ed. 2013); see also

Steuart v. McChesney, 498 Pa. 45, 48–49, 444 A.2d 659, 661 (1982). "The

meaning of an unambiguous contract presents a question of law. . . ." Lesko v.

Frankford Hosp.–Bucks Cnty., 609 Pa. 115, 124, 15 A.3d 337, 342 (2011). The

"focus . . . is upon the terms of the agreement as *manifestly expressed*, rather than

as, perhaps, silently intended." Steuart, 444 A.2d at 661.

A court must consider the text as a whole when construing the language's

operative effect. Contrans, Inc. v. Ryder Truck Rental, Inc., 836 F.2d 163, 169 (3d

Cir. 1987). "[A]ll provisions in the agreement will be construed together and each

will be given effect . . . we will not interpret one provision of a contract in a

manner which results in another portion being annulled." LJL Transp., Inc. v. Pilot

Air Freight Corp., 599 Pa. 546, 560, 962 A.2d 639, 647–48 (2009) (internal

citations omitted). "[A] contract should be read so as to give meaning to all of its

terms when read as an entirety." Contrans, 836 F.2d at 169.

The Court assumes generally that the parties used words in their "commonly accepted and plain meaning." Steuart, 444 A.2d at 661. The Court also recognizes, however, "that every agreement is made and to be construed with due regard to the known characteristics of the business to which it relates . . . and hence the language used in a contract will be construed according to its purport in the particular business." Franklin Sugar Ref. Co. v. Howell, 274 Pa. 190, 118 A. 109, 110 (1922). The Court will not "rely upon a strained contrivancy" to establish ambiguity. Steuart, 444 A.2d at 663. Rather, the Court seeks to be faithful to the meaning that the parties would have given the language at the time of contracting, given their respective positions. Felmont Oil Corp. v. Cavanaugh, 300 Pa. Super. 520, 525, 446 A.2d 1280, 1283 (Pa. Super. Ct. 1982).

### B.   The Merits

The language of the Lease, Range's activities, and the positions of the Parties raise three legal issues. The issues are interrelated, as the resolution of the first issue necessarily impacts the resolution of the second and third issues.

First, did Range's activities prior to June 21, 2011, the expiration date of the Lease's primary term, constitute the "commencement of a well" as a matter of law? If Range's activity prior to June 21, 2011 constituted the commencement of a well as a matter of law, then to extend the Lease either: second, Range must have

validly unitized the Nehaurds' property under the Lease's terms, or, third, Range's actual drilling activity that was sufficient to constitute the commencement of a well was done "on the Leased Premises."[5]

The Court first articulates the material portions of the Lease and their operation, and then addresses these three issues *seriatim*.

     1.    <u>Material Provisions of the Lease</u>

Oil and gas leases typically contain a primary term of fixed duration, expressed as a number of years.  The habendum clause of an oil and gas lease, which generally establishes the primary term, describes "the duration of the interest granted, subject to modification by other provisions contained in the lease which may provide for an extension of the lease."  3-27 EUGENE KUNTZ, ET AL., KUNTZ, LAW OF OIL AND GAS § 27.1 (2013).  Such a lease will terminate at the expiration of its primary term if the Lessee has not engaged in those acts prescribed in the lease that modify the duration or activate a secondary term.

The Lease *sub judice* articulates its primary term as follows:

1.1    It is agreed that this Agreement shall remain in force for a term of five years from the date first written above (hereinafter designated "Primary Term"), and shall continue from year to year thereafter for so long as . . . the Lessee is engaged in a bona fide attempt to secure

---

[5] The issues in this case relate as a logical conjunction as illustrated:

Extension of Lease = Commencement AND (on valid Unit OR on Leased Premises).

or restore the production of oil, gas and/or coalbed methane gas or other liquid hydrocarbons by conducting drilling or reworking operations on the Leased Premises . . . .

Def.'s Br. Supp. Ex 1, at 2, §1.1 [hereinafter Lease].

The commencement clause of the Lease both prescribes the Lease's automatic termination at the end of its primary term (absent the Lessee's action to extend the Lease) and provides the means by which the Lessee can activate the secondary term of the Lease:

> 8.1   Unless sooner terminated as otherwise herein provided, Lessee **shall commence a well** on the Leased Premises or on a spacing unit containing a portion of the Leased Premises, **within five (5) years** from the date first written above and shall drill said well with due diligence.  **In the event the aforesaid well is not commenced within such five (5) year period, this Agreement shall be automatically terminated in its entirety**, unless Lessor approves in writing, thirty (30) days in advance of the anniversary date of this Agreement, the continuation of this Agreement on a year-to-year basis.

Lease, §8.1 (emphasis added).

Read together, these two provisions allow the Lessee to extend the primary term of the Lease beyond June 21, 2011 if the Lessee commenced a well on the Leased Premises or a unit containing a portion of the Leased Premises before the expiration of the primary term.[6]  If the Lessee did not fulfill those conditions, the

---

[6] The Lessee did not seek an extension of the Lease in writing nor did the Lessor approve any such extension.  The possibility of extending the Lease in this manner is not at issue.

11

Lease expired by its own terms at the end of the primary term.

2.    Range "Commenced a Well" as a Matter of Law

The phrases "conduct drilling operations" and "commence a well," as utilized in this Lease, are construed broadly to include activities often performed in preparation for drilling—the physical act of drilling before the expiration of the primary term is not a necessary prerequisite to extend a lease.  This Court recently decided this particular issue in Roe v. Chief Exploration & Development LLC, 4:11-cv-00816, 2013 WL 4083326 (M.D. Pa. Aug. 13, 2013), finding that activity undertaken in good faith in preparation to drill satisfied a lease's commencement clause.  The Court cited to learned treatises that explain:

> The general rule is that actual drilling is unnecessary, but the location of well sites, hauling lumber on the premises, erection of derricks, providing a water supply, moving machinery on the premises and similar acts preliminary to the beginning of the process of drilling, when performed with the bona fide intention to proceed with diligence toward the completion of the well, constitute a commencement or beginning of a well or drilling operations within the meaning of the lease.

NANCY SAINT-PAUL, SUMMERS OIL AND GAS § 15:10 (3d ed. 2013); see also Pemco Gas, Inc. v. Bernardi, 5 Pa. D. & C.3d 85, 92, 1977 WL 260 (Pa. Com. Pl. 1977).  Another treatise states:

> Although there is some limited authority to the contrary, in general it appears that the courts have been ready to find the commencement of operations (or the pursuit of drilling operations) where only the most

> modest preparations for drilling have been made . . .
>
> . . .
>
> In brief, drilling operations may be described as any work or actual operations undertaken or commenced in good faith for the purpose of carrying out any of the rights, privileges or duties of the lessee under a lease, followed diligently and in due course by the construction of a derrick and other necessary structures for the drilling of an oil and gas well, and by the actual operation of drilling in the ground.

PATRICK H. MARTIN & BRUCE M. KRAMER, WILLIAMS & MEYERS, OIL AND GAS LAW § 618.1 (2013).

Pennsylvania cases adopt this posture as well.  See, e.g., Henderson v. Ferrell, 183 Pa. 547, 38 A. 1018 (1898); Bernardi, 5 Pa. D. & C.3d at 92–96; see also Good Will Hunting Club, Inc. v. Range Res.-Appalachia, LLC, 4:11-CV-1152, 2013 WL 2297170, *17–18 (M.D. Pa. May 24, 2013).  For example, in the now seminal case of  Pemco Gas, Inc. v. Bernardi that court held that the defendant "had commenced operations within the generally accepted meaning of that phrase." Bernardi, 5 Pa. D. & C.3d at 95.  In the period from three months prior to the expiration of that lease to the day the primary term expired, the defendant surveyed the site, began negotiations concerning the location of the site and the location of the right-of-way with the plaintiffs, acquired a right-of-way over a neighboring property, hired contractors to do the excavation and drilling work, applied for and

acquired a drilling permit, and placed pipe on the site.[7]  Id. at 95–96.

Similarly, the Supreme Court of Pennsylvania has held that the preparatory actions of staking the location of a well and attempting to unload lumber at the site on the final day of the primary term constituted drilling operations sufficient to extend the lease.  Henderson, 38 A. at 1019.  This activity comprised the commencement of drilling operations as a matter of law.  Id.

In the case before the Court, Range's activities before the expiration of the Lease's primary term on June 21, 2011 included, but were not limited to: (1) obtaining regulatory permits and approvals from government agencies; (2) staking the location for the well drill site; (3) negotiating agreements with Plaintiffs and neighboring landowners regarding drilling operations; (4) obtaining easements; (5) removing timber; and (6) constructing road access and the pad site for the well to begin drilling.  These activities are sufficient to constitute the commencement of a well as a matter of law.[8]  See, e.g., Bernardi, 5 Pa. D. & C.3d at 95–96; Henderson, 38 A. at 1018–19; SUMMERS OIL AND GAS § 15:10; WILLIAMS & MEYERS, OIL AND

---

[7] Additional cases of persuasive authority discussed by the court in the Bernardi decision include: Allen v. Cont'l Oil Co., 255 So.2d 842 (La. 1971); Walton v. Zatkoff, 372 Mich. 491, 127 N.W.2d 365 (1964); Peterson v. Robinson Oil & Gas Co., 356 S.W.2d 217 (Tex. 1962); Jones v. Moore, 338 P.2d 872 (Okla. 1959).

[8] The Plaintiffs do not contest that the Defendant's actions were done in good faith and that the Defendant diligently continued the drilling operations.

GAS LAW § 618.1.

### 3.   Unitization

Even though Range's activities in beginning the well on the neighboring

Null property satisfied the commencement clause as a matter of law, by the terms

of the Lease those drilling activities must have been preformed either "on the

Leased Premises or on a spacing unit containing a portion of the Leased Premises"

in order to extend the Lease.  Lease, § 8.1.  Range's activities prior to the

expiration of the primary term were not "on the Leased Premises."[9]  Id.

Consequently, they must have been performed "on a spacing unit containing a

portion of the Leased Premises" in order to extend the Lease.  Id.

Unitization, a common practice of the oil and gas industry that creates units

contemplated in the Lease, "refers to the consolidation of mineral or leasehold

interests in oil or gas covering a common source of supply."[10]  Amoco Prod. Co. v.

Heimann, 904 F.2d 1405, 1410 (10th Cir. 1990).  The consolidated unit of

"leasehold interests covering all or part of a common source of supply . . . [serves]

---

[9] The Court elaborates on this issue in the final subsection (4) below.

[10] "Although the terms 'pooling' and 'unitization' are frequently used interchangeably, more properly 'pooling' means the bringing together of small tracts sufficient for the granting of a well permit under applicable spacing rules whereas 'unitization' . . . means the join operation of all or some part of a producing reservoir."  6-9 WILLIAMS & MEYERS, OIL AND GAS LAW § 901.

to maximize production by efficiently draining the reservoir." 1 B. KRAMER & P. MARTIN, THE LAW OF POOLING AND UNITIZATION § 1.02 (3d ed. 2013). Furthermore, "the goals of unitization are conserving resources by preventing waste and protecting landowners' correlative rights."[11] Heimann, 904 F.2d at 1410–11.

Under a typical oil and gas lease, absent government involvement, the lessee's only authority to unitize the leased premises with other lands is derived from the permission granted to the lessee by the lessor, expressed in the terms of the lease agreement. Amoco, 904 F.2d at 1411 (citing KRAMER & MARTIN, §8.01). Once a lessor grants the lessee that interest in a lease, however, the lessee possess the power to unitize the lessor's interest without further consent. Id. Consequently, a lessor can limit that authority in any way in the terms of the agreement to protect its interests. The lessee retains freedom of contract and is not obliged to contract with a lessor demanding unreasonable or objectionable unitization conditions. Nevertheless, when a lessee signs an oil and gas lease, its unitization authority extends only so far as the terms of that lease provide. "Despite the attitude that the pooling clause is to be liberally construed, each

---

[11] "Correlative rights are rights which one owner possesses in a common source of supply in relation to those rights possessed by other owners in the same common source of supply." Heimann, 904 F.2d at 1411 n.4 (quoting United Petroleum Exploration v. Premier Res., 511 F. Supp. 127, 129 (W.D. Okla. 1980)) (internal quotations omitted).

pooling clause must be carefully examined for specific provisions that restrict the power, prescribe the manner in which it may be exercised, and describe the consequence of its exercise."  4-48 KUNTZ, LAW OF OIL AND GAS § 48.3(a)(1).

The concrete issue before the Court is whether Range's designation of a unit of approximately three hundred ninety-five (395) acres exceeded its unitization authority under the Lease.  The Neuhards contend that Range was limited to creating a unit of 350 acres by the terms of the Lease.

> I.   *Material Provisions Regulating Unitization Authority and Well Spacing*

The unitization portion of the Lease provides:

> Lessee shall have the right at any time or times to pool and consolidate the Leased Premises, in whole or in part or as to any stratum or strata, with lands or leases adjacent to or in the immediate vicinity of the Leased Premises, so as to constitute a unit or units for the purpose of entering, with the owners and/or lessees, into joint operating agreements providing for the joint operation and development of the Leased Premises or portions thereof with adjoining lands to prevent the drilling of an excess number of wells or of wells located too close to the boundary of the Leased Premises, providing that said unit or pool is not arbitrary and the acreage constituting the unit or pool is comprised of a minimum of 50% of the Lessor's acreage OR Lessor has approved such unitization in writing to Lessee.  In the absence of any spacing order, rule, or regulation of the Pennsylvania Department of Environmental Protection, any such unit or units shall be limited in size to the area surrounding each well provided for in Section 9.2 above.

Lease, § 12.1.

Section 12.2 further provides that "drilling . . . operations upon . . . any such unit shall be treated, for all purposes hereunder, as operations upon . . . the Leased Premises." Lease, § 12.2. Section 9.2, however, limits the maximum size of each unit created under the Lease, as it reads:

> Lessee shall not be required under this provision to drill more wells than required or allowed under any spacing order, rule, or regulation of the Pennsylvania Department of Environmental Protection, or in the absence of any such order, **more than one well in the . . . (iv) three hundred fifty (350) acres around each well** from which gas is being produced as the principal product from depths above the top of the Onondaga Formation.

Lease, § 9.2 (emphasis added).

The Neuhards submit that, by the plain language of the lease, the acreage amounts articulated in section 9.2 operate so as to limit the maximum extent of a unit's size to the 350 acres surrounding each well, based on the allusion to section 9.2 in section 12.1. Under this construction, Range exceeded its unitization authority.[12]

In contrast, Range contends that reading sections 9.2 and 12.1 together limits Range's pooling authority in three ways: (1) the unit must not be arbitrary; (2) the pooled unit must be comprised of a minimum of 50% of the Neuhards'

---

[12] The Neuhards did not approve Range's unitization in writing as contemplated by the Lease.

acreage; and, (3) the total acreage in the unit must not exceed 350 acres

*surrounding each well in the unit*.  Range submits that based on this language, it

has authority to create a unit containing three wells with an acreage limitation of

1050 acres (the product of 3 wells with 350 acres around each).  Under Range's

interpretation, the exercise of its unitization authority was proper.

The Lease does contemplate the possibility of more than one well per unit,

such that Range's interpretation is plausible.  The Lease, however, requires the

Lessee to obtain the Lessor's permission in order to drill more than one well per

unit.  The Lease provides:

> Well spacing shall not be closer than one (1) well per spacing unit as
> indicated in Section 9.2, unless Lessee has obtained written approval
> from the Lessor, which shall not be unreasonably withheld or delayed
> . . . .

Lease, § 10.2.

### ii.    *Range Exceeded Its Unitization Authority*

Each Parties' construction of the Lease is partly apt and part in error.  The

Lease's provisions, particularly concerning unitization and well spacing, manifest

at least three interests that conflict in the current dispute: (1) the Neuhards' interest

in ensuring their mineral estate comprises an appropriate percentage of any unit

producing oil or gas, so that their royalties are not diluted;[13] (2) all Parties'
(primarily the landowners) interests in minimizing surface disruption from
drilling;[14] and, (3) Range's interest in drilling wells as efficiently as economically
possible.[15]  All three of these interests are represented in varying degree in different
terms of the Lease, and the confluence of these interests is the focal point for
resolution of the current dispute.

        a.      The Lease's Plain Terms Limit Maximum Unit
                 Size to 350 Acres Absent Permission

      The Court holds that Range's unit designation violates its unitization
authority under the plain and unambiguous terms of the Lease, because the Lease is
clear that a unit cannot be larger than 350 acres surrounding each well in the unit,
and a unit cannot contain more than one well without the permission of the Lessor,

---

[13] This interest is effectuated in the operation of the Lease's terms, for example,
construing together sections 12.1, 9.2, and 10.2, as the Court subsequently elaborates.

[14] This interest is expressed in the Lease's language, for example: "Lessee agrees to drill
such wells as a reasonably prudent operator would drill . . . to develop and produce from the
Leased Premises efficiently, economically, without waste, and to the best advantage of Lessor."
Lease, § 10.1.  The interest is also expressed in this language: "[t]he Leased Premises are
continuously used for domestic, agriculture, recreational, and other purposes, and many activities
may be in progress on the lands.  Hence, Lessee shall conduct its operations so as to minimize
interference with the other activities on these Leased Premises."  Lease, § 7.1.

[15] This interest is evident as a textual matter throughout the Lease, most pertinently in the
introduction: "Lessee is desirous of leasing Lessor's oil, gas and coalbed rights contained in, on,
and under the Leased Premises for the purpose of exploring for . . . drilling, operating, producing
and removing oil, gas, coalbed methane gas and liquid hydrocarbons there from."  Lease,
Introduction.

which Range did not obtain.  <u>Steuart</u>, 444 A.2d at 661; <u>see also</u> <u>Trans-Western</u>

<u>Petroleum, Inc. v. U.S. Gypsum Co.</u>, 584 F.3d 988, 994–95 (10th Cir. 2009)

(Holloway, J.) (affirming a district court's decision finding a lease expired by its

terms at the end of its primary term because the defendant's unitization scheme

contradicted the unambiguous terms of the lease).

The Neuhards' interest in ensuring their land (and royalty payment)

comprises an appropriate percentage of any unit producing oil and gas to is

protected by multiple provisions, both those mandating a minimum utilization of

the Neuhards' land (section 12.1) and a maximum size of any unit (section 9.2).

Section 12.1 creates the unambiguous requirement that the Lessee use a minimum

of 50% of the Neuhards' 47 acres in any unit including the Neuhards' land.  This

ensures that the Neuhards' land will be included in a unit in at least a minimum

amount the Neuhards' deemed sufficient at the time of signing the contract, namely

50% of their 47 acres.

Furthermore, reading sections 9.2 and 10.2 together, it is clear the Leasee

cannot create a unit larger than 350 acres by drilling more than one well without

the Neuhards' permission.  This provision protects the Neuhards' interest from

dilution by preventing Range from including the Neuhards' land in a unit larger

than the 350 acre units contemplated by the Lease without the Neuhards' consent.[16]

> b.  Enforcing the Lease's Plain Terms Does Not Lead to Absurd Results and Is Harmonious with the Lease as a Whole

Range argues that this reading of the Lease's plain terms is inappropriate because it conflicts with the second and third interests enumerated above, namely the Parties' interest in minimizing surface disruption and Range's interest in developing resources in the most economically efficient manner.  These considerations are interrelated.  Range asserts the Court's reading of the Lease undermines those interests and leads to an absurd result. The Court's construction of the Lease is, however, both a proper reading of the Lease's clear and unambiguous terms, and does not lead to absurd results when construing the terms in the context of the time that the Parties signed the Lease.  See Cavanaugh, 446 A.2d at 1283 ("[I]t is the intention of the parties *at the time of entering in thereto that governs*, and such intention is to be gathered from a reading of the entire contract.").

The interest in minimizing surface disruption from drilling is expressed in aspirational language throughout the Lease.   For example, section 10.1 charges the

---

[16] Range also continually asserts that "capping [a] unit size at 350 acres is arbitrary in and of itself."  Def.'s Br. Opp'n 9, Jan. 4, 2013, ECF No. 29.  This argument has no merit in consideration of the unambiguous language the Parties' agreed to at the time of signing the Lease.

Lessee with a duty to "develop and produce from the Leased Premises efficiently, economically, without waste, and to the best advantage of the Lessor."  Section 12.1 articulates a desire to "prevent the drilling of an excessive number of wells or of wells too close to the boundary of the Leased premises."  Consistent with this expressed aspirational purpose, Range argues that "the intent for Section 10.2 of the Lease is to protect the Lessors from unreasonable surface intrusions resulting from the construction and operation of numerous pad sites on the leased premises." Def.'s Br. Supp., at 17.

It is clear from the language of the Lease that the Parties intended to minimize surface disruption.  Construing the Lease as a whole, however, it is also clear that the requirement of permission in section 10.2 not only encourages minimal surface disruption, but also unmistakably protects the Neuhards' interest from being diluted in a unit larger than 350 acres without their permission.  A single term may serve multiple purposes.  Moreover, when the words are clear and unambiguous, a Court will not enforce one party's rendering of a provision's intent over the clear language of the contract.  See, e.g., Steuart, 444 A.2d at 661.

Range's argument rests only on the continued assertion that the permission provision is meaningless because none of Range's actual drilling activities have impacted the surface of the Neuhards' property.  Nevertheless, Range does not

address the provision's protection of the Neuhards' proportion of any unit created under the lease, nor the paramount consideration: the plain and unambiguous words of the Lease requiring permission.  See id.

It is true that the Neuhards' may not have been able to reasonably withhold consent based on surface disruption motives, and that they may have given consent to drill more than one well if asked.  These facts, however, do not obviate the Lease's express requirement for permission, nor was surface disruption the only interest protected by the permission requirement.[17]  In the Defendant's own words, "[a] contract should not be interpreted in a manner that renders provisions meaningless, superfluous, unreasonable, contradictory, or would lead to absurd results."  Def.'s Br. Reply Pls.' Br. Opp'n 6, Jan. 18, 2013, ECF No. 33 (citing, inter alia, Lesko, 15 A.3d at 342–43).  Dismissing the plain language of the permission requirement would be contrary to firmly established law by rendering the provision meaningless, and the Court declines to do so.

Moreover, even if permission was unnecessary by the Lease's language or if it was granted, Range has not demonstrated its current unit configuration is

---

[17] The Parties dispute whether the Neuhards would have given consent to allow more than one well in a unit.  Barbara Neuhard indicates she would have required more information and deliberation before deciding the matter.  See Pls.' Br. Supp., Ex. F, Dep. Barbara Neuhard, 52–53.  Moreover, it appears the Neuhards' could have reasonably withheld consent for the purpose of protecting against the perceived dilution of their interest in a unit.

appropriate under its own construction of the Lease.  The Lease allows for units

larger than 350 acres if the unit contains more than one well, because units are

limited in size to the "three hundred fifty (350) *around* each well."  Lease, § 9.2.

"Around" is not a term of art, and is defined in its normal usage as: "a circle or in

circumference . . . on all or various sides."  MERRIAM-WEBSTER (11th ed.).[18]

Reading the plain terms of the Lease in their ordinary usage, then, the Lease

seems to suggest that the 350 acres around each well would extend outward in an

approximate circle, or at least generally in all directions, with the well as the

epicenter and each point on the extremity generally equidistant from the well at the

approximate center.  The Court is cognizant that units are not generally concentric

circles and that an acre is a square unit of measurement.[19]  Nevertheless, the well

would not be located dramatically at one side of the 350 acres but at the relative

center with the acreage "around" the well, especially in light of the Lease's terms

and the drilling technology available at the time the Lease was signed.  The 350

acre unit contemplated by the Lease is around a vertical well, not traveling along

---

[18] In defining this and other terms throughout the opinion, the Court relies on the
dictionary as updated to date, not a dictionary from 2006.  Although when construing terms it is
generally appropriate to invoke their contemporary meaning to the extent possible, the Court is
confident that the meanings of fundamental propositions and adjectives in the English language
have not changed as dramatically since 2006 as, for example, drilling technology has.

[19] Acre is defined as: "a unit in the United States and England equal to 43,560 square
feet."  MERRIAM-WEBSTER.

the wellbore of a horizontal well made possible by drilling technology utilized after the Lease was executed.  See, e.g., Pls.' Br. Supp., Ex. H, Dep. Carl Steinle, at 73–74 [hereinafter Dep. Carl Steinle].

Therefore, to contain a unit as large as 1,050 acres as Range argues that the Lease allows, the three wells of that unit must be generally spaced out such that the well sites are located near the general center of the 350 acre areas around each well, with minimal overlap with another well's surrounding acreage and in a fashion that harmonizes the other provisions of the Lease as well as possible.  To form the 395 acre unit Range constructed, it appears from the language of the Lease that the wells must be spaced in such a way that the 350 acres around each well as the epicenter extends outward to include the extra 45 acres of the larger unit.  Range has not demonstrated that the three wells located on the same well pad site, within several dozen feet of each other, comport with this construction.

Range further argues that this interpretation of the Lease frustrates both the interests in minimizing surface disruption and developing the resources most economically, because it requires the construction of multiple well sites spaced in such a way to achieve the desired unit size.  This spacing is not necessary in light of current horizontal drilling technology, which allows Range to drill three wells from the same well site.  Consequently, Range argues this construction does not

26

make the most economic sense in the context of horizontal drilling.

This may be true today, but it was not true at the time the Parties signed the Lease. The horizontal drilling technology now readily in use was not then available in Pennsylvania, and not presumably contemplated by the parties. The Court is bound to construe the Lease at the time of signing, and, consequently in the context of then-available drilling technology. See Cavanaugh, 446 A.2d at 1283. General terms of a contract may embrace later technologies, but the terms themselves are still applied according to their ordinary meaning at the time they were used. See id.

Carl Steinle, Land Manager for Range, stated at his deposition that the Lease "was made for vertical wellbores. There were no horizontal wellbores that I know of in the State of Pennsylvania at the time the lease was executed." Dep. Carl Steinle, at 52–53. Consequently, the Court's construction leads to an ordinary and appropriate, rather than absurd result, when considering the Lease "with due regard to the known characteristics of the business to which it relates" at the time of signing. Franklin Sugar Ref. Co. v. Howell, 274 Pa. 190, 194, 118 A. 109, 110 (1922); Cavanaugh, 446 A.2d at 1238; see also United States v. Rabinowitz, 339 U.S. 56, 70 (1950) (Frankfurter, J., dissenting) ("Words must be read with the gloss of the experience of those who framed them.").

Finally, Range argues that finding it exceeded its unitization authority under the Lease is against the Neuhards' interest because Range would not use all of the Neuhards' 47 acres in a newly designated unit based on the 350 acre cap. This may be true, but the argument is unpersuasive for several reasons. First, the Neuhards brought this action and are presumably aware of possible consequences—it is not for Range or the Court to decide the wisdom or prudence of the Neuhards' decisions in pursuing their future economic interests. Second, Range presented two alternate unit configurations that do not utilize all 47 acres, but that does not mean there are not possible configurations that are both economically beneficial and do utilize all 47 acres; Range has little incentive to demonstrate those configurations now. Third, in light of the fact that this Lease expired and that Range has utilized drilling technology not contemplated by its terms, it would seem appropriate for the Parties to negotiate a new Lease with terms amenable to current circumstances and without the 350 acre cap, if this is the course they wish to take.

The Court is cognizant of the ramifications of enforcing the Lease's terms. This is not an academic exercise of hyper-technical trivialities, but rather a decision with eminent practical effect. Range has invested substantial sums of money into the project and this decision does have economic ramifications.

28

Those ramifications, however, extend beyond the immediate relationship between the parties.  "The most important function of contract law is to provide a legal remedy for breach in order to enhance the utility of contracting as a method of organizing economic activity . . . ."  Richard A. Posner, *The Law and Economics of Contract Interpretation*, 83 TEX. L. REV. 1581, 1582 (2005) [hereinafter Posner].  This function may be independent of interpreting contract terms, but it is also realized when courts enforce contracts as written and, consequently, provide a stable and predictable contracting environment for that economic activity to flourish.[20]

Enforcing contracts as written may also encourage better draftsmanship in the first instance.  When it is clear that contracts will be enforced according to their terms, parties know they cannot write ambiguities into agreements so that they can act as they wish without regard to the terms of the bargain and "idly assume that judges will save them from their blunders."  ANTONIN SCALIA & BRYAN A.

---

[20] The Court is aware that shifting the costs of writing clear and more thoroughly prospective contracts to the parties on the front end, rather than expending those costs on litigation to resolve disputes after they occur may, in some instances, result in a more costly and less efficient outcome.  See, e.g., Richard A. Posner, *The Law and Economics of Contract Interpretation*, 83 TEX. L. REV. 1581, 1583–84, 1608–14 (2005) (articulating the variables that impose costs in the process of drafting, litigating, and interpreting contracts, and demonstrating the various implications of shifting this cost burden).  Nevertheless, the Court is persuaded that the benefit of sound contract law and a clear rule under which parties may bargain facilitates stable foundations for a fountainhead of economic activity.

GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS xxviii (2012).[21]

Even when contracts are enforced as written, however, parties may still choose to rely on ambiguous form contracts and chance the hazards of litigation. That is an economic decision that depends on the particulars of each situation. See, e.g., Posner, at 1583–84, 1608–14. Regardless of an individual's choice on that matter, however, when courts enforce contracts according to their terms parties can generally predict a court's decision based on clear text in the event of litigation. This provides a measure of stability for one variable in the calculus of the parties' economic decision-making. See id.

In this case, instead of proceeding with a questionable plan in light of the Lease's language and changed technology, Range could have renegotiated the language and entered a new agreement. Transaction costs aside, nothing prevented this course of action. Furthermore, nothing prevents the Parties from renegotiating in the wake of this decision.

This Court will not refuse to enforce a clear and unambiguous contract and will not nullify its terms simply because a party disregarded the agreement or formulated a strained contrivance of its terms and made a business decision to

---

[21] See also Felix Frankfurter, *A Symposium on Statutory Construction: Foreward*, 3 VAND. L. REV. 365, 368 (1950) ("Judicial expansion of meaning beyond the limits indicated is reprehensible because it encourages slipshodness in draftsmanship and irresponsibility in legislation. It also enlists too heavily the private social and economic views of judges.")

proceed with substantial investment.  See Dep. Carl Steinle, at 67–68.  The Lease

was drafted with expressed limitations that frustrate Range's ability to utilize

modern horizontal drilling techniques.  While this may be true, it does not change

the language of the Lease.  Range's proper remedy for this problem was to

negotiate a new lease that allowed Range to develop the property in the manner

desired.  Enforcing contracts as written provides a clear foundation upon which

parties can conduct this bargaining efficiently and carefully, and rest assured their

terms will be honored.

### 4.   Drilling Adjacent to Premises Did Not Extend Lease

In a final attempt to save the Lease, Range argues that its activities on the

Null Property prior to the expiration of the Lease's primary term constitute drilling

operations sufficient to preserve the Lease, because the drilling resulting from

those initial operations would eventually pass on or under the Neuhards' property.

This argument is also unavailing.

The Lease unambiguously requires Lessee to "commence a well *on* the

Leased Premises or on a spacing unit containing a portion of the Leased Premises."

Lease, § 8.1 (emphasis added).  Although Range undoubtedly commenced a well

prior to the expiration of the primary term, it did not do so *on*[22] the Leased

---

[22] The word "on" is not a term of art, and is defined in its normal usage as a preposition meaning, *inter alia*: "a function word to indicate position over and in contact with that which

premises, but on a premises adjacent[23] to the Leased Premises that was not unitized according to the Lease.  Under a plain reading of the Lease, Range's activities on the Null Property adjacent to the Leased Premises do not constitute drilling activities "on the Leased Premises."  Nor was there a sufficient modicum of activity in preparation for drilling on the Leased Premises during the primary term in order to extend the Lease—the operative activity was performed *on* the Null Property.  Mere permitting and traversing without more is insufficient, particularly under the language of this Lease.  See, e.g., Bernardi, 5 Pa. D. & C.3d at 92–96; SUMMERS OIL AND GAS § 15:10 (listing physical activities as the primary operative acts of commencing drilling operations).

In advancing its argument, Range relies on two non-binding cases that are readily distinguishable from the current scenario.  In A & M Oil, Inc. v. Miller, 11 Kan. App. 2d 152, 154–55, 715 P.2d 1295, 1296–97 (1986), a Kansas court found that the clear "language of the drilling operations clause" and the defendant's activity during the primary term that commenced operations to drill a well on a neighboring property that would eventually pass under the leased premises were

---

supports from beneath . . . used as a function word to indicate a presence within."  MERRIAM-WEBSTER.

[23] "Adjacent" is an adjective defined as, *inter alia*: "having a common border: abutting, touching."  MERRIAM-WEBSTER.

sufficient to extend the lease.  The drilling operations clause at issue in that case

provided:

> [I]t is expressly agreed that if lessee shall commence operations for
> drilling at any time while this lease is in force, this lease shall remain
> in force and its terms shall continue so long as such operations are
> prosecuted and, if production results therefrom, then as long as
> production continues.

A & M Oil, Inc. v. Miller, 11 Kan. App. 2d 152, 152, 715 P.2d 1295, 1296 (1986).

The broad language of the drilling operations clause at issue in Miller is

distinctly different from the clause at issue in the case before the Court.  In Miller

the operations clause contained no temporal or geographic language qualifying the

phrase "lessee shall commence operations for drilling at any time."  Miller, 715

P.2d at 1296.  Accordingly, the court found that there was no requirement that

those operations take place on the plaintiff's leased premises.

In the case *sub judice*, by contrast, the drilling operations clause is explicit

that "Lessee shall commence a well on the Leased Premises."  Lease, § 8.1.  The

language qualifying the location of Lessee's activities renders the Lease at issue

sufficiently distinct from the lease in Miller such that the outcome of that case is

not persuasive on this Court's ultimate holding.  The court's decision in Miller is

persuasive, however, in reinforcing the black letter law that when the unambiguous

language is clear, an agreement's terms should be enforced accordingly.[24]  Id. at

1296–97.

In Manzano Oil Corp. v. Chesapeake Operating, Inc., 178 F. Supp. 2d 1217,

1220 (D.N.M. 2001), which Range also cites for support, a United States

Magistrate Judge in the United States District Court for the District of New Mexico

held that, under New Mexico law, the defendant who began drilling on a three acre

property adjacent to the leased property during the primary term extended the lease

on the property at issue.  In that case, the defendant could not drill on the leased

property without first obtaining a special zoning permit or variance that was

difficult to acquire, so the defendant purchased the adjacent three acre property on

which drilling was allowed and commenced a well.  Manzano Oil Corp. v.

---

[24] Further applying this principle of law, another consideration in construing this Lease is whether drilling *under* the Leased Premises would even satisfy the drilling operations clause as written.  In the Lease, the drilling operations clause only contemplates drilling "*on* the Leased Premises or *on* a spacing unit containing a portion of the Leased Premises."  Lease, § 8.1. Elsewhere in the Lease, however, the drafter distinguished between the "Lessor's oil, gas and coalbed methane gas rights contained *in*, *on*, and *under* the Leased Premise for the purpose of . . . drilling, operating, producing and removing oil, gas, coalbed methane gas, and liquid hydrocarbons there from."  Lease, Introduction.

The Lease drafter recognized a distinction between the prepositions in, on, and under, and only used "on" in the drilling operations clause.  The doctrine of *expressio unius est exclusio alterius* instructs that when certain words are used in a contract and other words omitted, it implies the intentional exclusion of the omitted terms.  See, e.g., Linan-Faye Const. Co., Inc. v. Hous. Auth. of City of Camden, 49 F.3d 915, 936 (3d Cir. 1995); BLACK'S LAW DICTIONARY (9th ed. 2009).  Applying this principle here, drilling "under" the Leased Premises would not necessarily satisfy the drilling operations clause that used only "on," when both words were used together earlier in the document.  This construction also makes sense in the context of drilling technology available at the time the Lease was signed.  See Dep. Carl Steinle, at 70–72.

<u>Chesapeake Operating, Inc.</u>, 178 F. Supp. 2d 1217, 1218–19 (D.N.M. 2001).  The defendant's drilling plan would eventually cross onto the subterranean portion of the leased property, but not until after the expiration of the primary term.  <u>Id.</u> Relying on the broad language of the lease's pooling clause, the court wrote: "I find that adjacent property and the Lease property were 'pooled' or 'combined' in such a way as to" extend the lease by the commencement of drilling.[25]  <u>Id.</u> at 1220.

 The decision in <u>Manzano Oil Corp.</u> is also distinguishable from the case before the Court, because the court in <u>Manzano</u> based its holding on the critical fact that the adjacent land and leased land were pooled validly by the authority granted under the lease, regardless of the planned eventual drilling beneath the leased premises.  <u>See id.</u>  The drilling under the leased property after the primary term expired did not impact the court's holding, and, consequently, the case does not support Range's position.  <u>See id.</u>

---

[25] The court described the lease's pooling clause, writing:

Paragraph five of the Lease provides, in pertinent part, that Defendant, the lessee, is "granted the right . . . to pool or combine this lease, the land covered by it or any part or horizon thereof with any other land, leases, mineral estates or parts thereof for the production of oil or gas."  Paragraph five also contains the following language, to wit:

Drilling operations on or production from any part of any such unit shall be considered *for all purposes*, except the payment of royalty, as operations conducted upon or production from the land described in this lease.

<u>Manzano Oil Corp.</u>, 178 F. Supp. 2d at 1219.

Accordingly, the clear and unambiguous language of the Lease controls. <u>Steuart</u>, 444 A.2d at 661.  Range did not "commence a well on the Leased Premises or on a spacing unit containing a portion of the Leased Premises," before the expiration of the primary term.  As a consequence, the Lease expired by its own terms.

## III.   CONCLUSION

In sum, Range commenced a well before the expiration of the Lease's primary term.  That well, however, was neither "on the Leased Premises" nor "on a unit containing a portion of the Leased Premises."  Range exceeded its unitization authority under the plain and unambiguous language in the Lease and did not commence a well on the Neuhards' property.  Consequently, the Lease expired by its own terms on June 21, 2011.

The Neuhards' Motion for Summary Judgment is granted.  Range's Motion for Summary Judgment is denied.

An appropriate Order follows.

BY THE COURT:

<u>s/ Matthew W. Brann</u>
Matthew W. Brann
United States District Judge